UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re:

Omonuwa G. Omogun,

               Debtor.

------------------------------------------------------------------X
Onyenaemeka Ethelberth,

               Plaintiff,

        v.

Omonuwa G. Omogun,

               Defendant.

------------------------------------------------------------------X

Chapter 7

Case No.: 8-16-75566-las

Adv. Pro. No.: 8-17-08023-las

MEMORANDUM DECISION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I.     Introduction

       Plaintiff Onyenaemeka Ethelberth ("plaintiff") commenced this adversary

proceeding seeking a judgment denying defendant Omonuwa G. Omogun ("defendant" or

"Mr. Omugun"), the debtor in this chapter 7 case, a discharge of his debts under 11 U.S.C.

§ 727(a)(2), (a)(3), and (a)(4)(A).[1] Specifically, plaintiff alleges that defendant concealed

property of the estate with actual intent to hinder, delay or defraud creditors (§ 727(a)(2)),

concealed or failed to keep or preserve records from which his financial condition or business

transactions might be ascertained (§ 727(a)(3)), and knowingly and fraudulently made false

oaths in connection with his bankruptcy case (§ 727(a)(4)(A)). In the alternative, plaintiff

seeks to except from discharge a debt owed to it by defendant in the amount of $220,605.01.

---

[1] All statutory references to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, will hereinafter
be referred to as "§ (section number)".

The debt arises out of a prepetition judgment entered in favor of plaintiff and against defendant in the United States District Court for the Eastern District of New York ("District Court") on August 25, 2016. Plaintiff contends that the debt was incurred by defendant's willful and malicious conduct. This, plaintiff argues, renders the debt at issue non-dischargeable under § 523(a)(6).

Presently pending before the Court is plaintiff's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), made applicable to this adversary proceeding by Bankruptcy Rule 7056 (the "Motion"). [Dkt. Nos. 37 – 44]. Defendant filed opposition to the Motion, [Dkt. No. 48], and plaintiff filed a reply, [Dkt. No. 49]. Plaintiff subsequently moved to supplement the summary judgment record with certain exhibits that were cited in plaintiff's Statement of Material Facts filed pursuant to E.D.N.Y. Local Bankruptcy Rule ("LBR") 7056-1 ("Rule 7056 Statement"), but inadvertently omitted from the Court's docket. [Dkt. No. 51]. The Court granted plaintiff's motion to supplement the record, after notice and a hearing, without any opposition from defendant. [Dkt. No. 55].

The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334 and the Standing Order of Reference entered by the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 157(a), dated August 28, 1986, as amended by Order dated December 5, 2012.

For the reasons discussed below, the Court grants plaintiff's motion for summary judgment pursuant to § 727(a)(4)(A). Defendant's discharge is denied.

II.    Background

    A.  Undisputed Material Facts

The following material facts are either undisputed or have been ineffectively disputed by defendant. As explained below, the Court does not, except as noted, set forth defendant's version of the facts where disputed because defendant failed to properly contest an asserted

fact. By failing to properly controvert plaintiff's Statement of Material Facts, the material facts set forth in plaintiff's statement are "deemed to be admitted" for purposes of the summary judgment motion to the extent they are supported by the record. E.D.N.Y. LBR 7056-1(c). A mere denial by defendant without citation to admissible evidence in the record is insufficient. *See Covelli v. Nat'l Fuel Gas Distrib. Corp.*, No. 99-CV-0500E(M), 2001 WL 1823584, at *1 (W.D.N.Y. Dec. 6, 2001), *aff'd,* 49 F. App'x 356 (2d Cir. 2002).

On or about November 30, 2016, Mr. Omugun filed a voluntary petition under Chapter 7 of the Bankruptcy Code with the Clerk of this Court (the "Petition"). [Declaration of Kenneth A. Goldberg in Support of Plaintiff's Motion for Summary Judgment ("GD") Exh. 2]. Mr. Omugun, represented by legal counsel, reviewed the Petition before it was filed, approved it for filing, and swore that it was true, accurate and complete when filed. [GD Exh. 2; Exh. 7, Dep. Tr. 21:10-22:15; GD Exhs. 5-6]. In the Petition, Mr. Omugun made sworn statements regarding his employment status, businesses and business activities, bank accounts and other financial accounts, real property, and other assets, all of them under penalty of perjury. [GD Exh. 2].

Mr. Omugun testified under oath at a meeting of creditors held pursuant to § 341 on January 25, 2017 ("Jan. 341 Meeting"), [GD Exh. 3 ("Jan. Tr.")], and on April 18, 2017 ("Apr. 341 Meeting," together with the Jan. 341 Meeting, the "341 Meetings"), [GD Exh. 4 ("Apr. Tr.")]. Mr. Omugun swore that his Petition was true and complete and that he did not want to make any changes to it. [GD Exh. 3, Jan. Tr. 4:20-5:6; GD Exhs. 5-6]. Mr. Omugun also swore that all his testimony was truthful. [GD Exh. 7, Dep. Tr. 7:24-8:9].

Thereafter, plaintiff commenced this adversary proceeding against defendant. [GD Exhs. 5, 60]. Mr. Omugun was deposed ("April 2018 Deposition") [GD Exh. 7 ("Dep. Tr.")]. Defendant received and reviewed the Complaint, filed an Answer, and swore that his Answer was true and accurate. [GD Exh. 7, Dep. Tr. 30:20-24, 31:21-23, 32:10-25; GD Exhs. 5, 6, 60].

3

1.  Contents of the Petition and Testimony at § 341 Meetings

In the Petition, Mr. Omugun swore that he is not the sole proprietor of any fulltime or part-time business. [GD Exh. 2, Petition, Form 101 Part3, Form 106Sum Part 3]. In the Petition, Mr. Omugun swore that his sole occupation was cab driver, and his sole earnings were $1,000 per month. [GD Exh. 2, Petition, Form 106l, Form 122A-1). In December 2016, Mr. Omugun filed an Affidavit reiterating same. [GD Exh. 7, Dep. Tr. 26:24-28:5; GD Exh. 10]. At the Jan. 341 Meeting, Mr. Omugun again swore that his sole occupation was cab driver. [GD Exh. 3, Jan. Tr. 8:7-10, 8:17-19, 13:9-11, 13:21, 24:22-25:4]. At the April 2018 Deposition, Mr. Omugun again swore that as of December 21, 2016, his sole means of income was cab driver. [GD Exh. 7, Dep. Tr. 28:14-24].

a.  Catskill Security Training Corp. and Choice Security Company

In or about 2003, Mr. Omogun registered Choice Security, a company engaged in the business of providing security guards to clients. [GD Exh. 14; GD Exh. 7, Dep. Tr. 36:19-37:12]. In the Petition, Mr. Omugun swore that he owned two businesses: (a) Choice Group, Inc. dba Choice Security Company ("Choice Security" or "Choice Security Company"); and (b) Catskill Security Training Corp. ("Catskill Security"). [GD Exh. 2, Petition, Form 107 Part 11; GD Exhs. 5-6, Compl. ¶ 58 & Ans. ¶ 58]. In the Petition, Mr. Omugun swore that his two businesses were non-operational, and that: (1) Choice Group (Choice Security) existed from 2004-December 2015; and (2) Catskill Security existed from 2010-2015. [GD Exhs. 2, 5-6]. At the Jan. 341 Meeting, the Trustee asked Mr. Omogun "Have you owned or initiated any business in the last six years" and Mr. Omogun answered "No, sir." GD Exh. 3, Jan. Tr. 7:9-11].

At the Jan. 341 Meeting, Mr. Omogun also swore that that Catskill Security was nonoperational: (1) "The security training school, which I don't do now" [GD Exh. 3, Jan. Tr. 7:21-25]; and (2) "it's a school but which is not in operation." [GD Exh. 3, Jan. Tr. 24:16-18].

Mr. Omogun, at his April 2018 Deposition, contradicted his prior testimony. At his April 2018 deposition, Mr. Omogun testified that he has provided training from 2017 forward, for which he was paid. [GD Exh. 7, Dep. Tr. 76:25-77:25, 78:6-8].

At the Jan. 341 Meeting, Mr. Omogun also swore that: (1) Choice Security was closed. [GD Exh. 3, Jan. Tr. 16:3-9]; (2) Choice Security was no longer an existing corporation [GD Exh. 3, Jan. Tr. 23: 21-25]; and (3) that last time Choice Security provided any security guard services was in 2016. [GD Exh. 3, Jan. Tr. 24:1-6]. At both 341 Meetings, Mr. Omogun swore that he was not engaged in the security guard business and had no security guard license, stating: (a) "'15, 16' I didn't do any job. I didn't do–I am not been working since then." [GD Exh. 4, Apr. Tr. 6:23-24]; (b) "My license was taken from me–for security." [GD Exh. 3, Jan. Tr. 8:12-13]; and (c) "Even my .... they suspended my license." [GD Exh. 4, Apr. Tr. 6:24-7:2]. Mr. Omogun continued to swear that Choice Security was closed both by his written discovery responses and deposition testimony, asserting: (a) Choice Group lost its license to provide security guards, [GD Exh. 7, Dep. Tr. 44:25-45:5, 45:16-18, 46:9-47:8; GD Exhs. 15-17], and (b) "Choice Group did not file 2016 tax return as it ceased business in 2015," [GD Exh. 13 at 1; GD Exh. 7, Dep. Tr. 42:6-8].

Contrary to Mr. Omogun's sworn statements, Mr. Omogun was actively engaged in the security guard business through Choice Security Services, and he received substantial income from at least 2016 to present, an income stream (and assets) that Mr. Omogun concealed from this Court. [GD Exhs. 43-48, 34, 39, 40]. Mr. Omogun provided security guard services to Ashnu International Inc., Brewer Hotel LLC, National Maintenance Services, Inc., Security Resources, Inc., The Richmond Hotel, LLC, and Turner Construction Company, all of which issued checks payable to Choice Security Services. [GD Exhs. 43-48]. Mr. Omogun and Choice Security Company also made payments to each other. [GD Exhs. 49, 50].

b.  State Security Services

In 2014, Mr. Omogun registered State Security Services, which, according to public records, was active and existing, and is a security guard business. [GD Exh. 7, Dep. Tr. 85:8-19, 86:3-7; GD Exh. 22]. Mr. Omogun omitted State Security Services from his Petition. [GD Exh. 2]. At the Jan. 341 Meeting, when questioned about State Security Services, Mr. Omogun admitted he had registered that business, but swore that it was not in operation, testifying: (a) "it's not active yet," [GD Exh. 3, Jan. Tr. 23:12], and (b) "it's not in existence" [GD Exh. 3, Jan. Tr. 23:14]. In June 2017, Mr. Omogun submitted a "Defendant's Proposed Joint Discovery Control Plan" and "Letter" to the Court. [GD Exh. 7, Dep. Tr. 33:4-34:15; GD Exh. 11]. In the "Letter" Mr. Omogun stated: "As to the existence of State Security Services Inc. and Choice Security Company, while Debtor incorporated State Security Services, Inc. in 2014, it has not engaged in any business or activity (including seeking for any type of work or opening any bank account)." [GD Exh. 11 at Exh. A, Defendant's "Letter to Court"]. On December 4, 2017, Mr. Omogun, by counsel, responded to the plaintiff's discovery requests, stating: "State Security Services, Inc. has no security, or any other license issued to it and has not carried on any business." [GD Exh. 7, Dep. Tr. 35:10-21; GD Exh. 13].

By the Petition date, Mr. Omogun had already received substantial income through State Security Services and continued to receive substantial income from 2017 forward, which in 2017 alone apparently exceeded $60,000 based on copies of checks. [GD Exhs. 34, 35, 39, 40, 41, 42]. At Mr. Omogun's April 2018 Deposition, Mr. Omogun testified as follows. He is owner, President, and employee of State Security Services. [GD Exh. 7, Dep. Tr. 86:22-87:5]. State Security's business address is the same as his other companies, Choice Security and Catskill Security. [GD Exh. 7, Dep. Tr. 86:8-18]. He provided security guard services (or related services) from 2016 forward and was paid for the work. Mr. Omogun was still providing such security guard services. [GD Exh. 7, Dep. Tr. 141:9-16]. He admitted that he

had his clients issue checks payable to his company State Security Services [GD Exh. 7, Dep. Tr. 117:6-11, 117:22-119:4, 119:17-120:17, 120:25-121:11]. He maintained a bank account for State Security Services with JPMorgan Chase, which account existed pre-Petition, and he deposited payments received from his clients into that bank account. [GD Exh. 7, Dep. Tr. 121:7-15, 124:19-24; GD Exh. 37].

Prior to filing the Petition, Mr. Omogun provided security guard services to 44 Rockaway Beach LLC dba La Quinta ("44 Rockaway"), and 44 Rockaway issued checks payable to Mr. Omogun's company Choice Security Company for such services. [GD Exhs. 34, 39]. After the Petition Date, he continued to provide security guard services to 44 Rockaway. [GD Exh. 7, Dep. Tr. 50:18-51:6, 116:11-117:5; GD Exhs. 34, 40]. However, he had 44 Rockaway issue checks payable to State Security Services, rather than Choice Security Company. [GD Exh. 7, Dep. Tr. 115:21-119:4; GD Exhs. 34, 40]. Mr. Omogun testified that he worked no more than 40 hours per week at a rate of $14/hour. [GD Exh. 7, Dep. Tr. 51:7-10, 52:6-7]. However, Mr. Omogun regularly received payments of more than $1,000 per week from 44 Rockaway. [GD Exhs. 34, 39, 40]. Mr. Omogun deposited the checks made payable by 44 Rockaway to State Security Services into the State Security Services bank account with JPMorgan Chase. [GD Exhs. 35, 40; GD Exh. 7, Dep. Tr. 117:5-11].

Mr. Omogun admitted that he provided security guard services to Med-One Care, LLC ("Med-One"). [GD Exh. 7, Dep. Tr. 56:10-17, 57:3-59:14, 121:16-122:3, 123:8-11]. Mr. Omogun, when deposed regarding his income from such work, swore that Med-One "give me money as a gift." [GD Exh. 7, Dep. Tr. 59:22-23]. However, when questioned further, Mr. Omogun admitted that he had Med-One issue checks made payable to State Security Services, [GD Exh. 7, Dep. Tr. 60:2-6, 120:20-121:11], and he deposited all such checks into his State Security Services bank account, [GD Exh. 7, Dep. Tr. 120:20-121:6, 121:12-15]. Payments were issued from at least January through June 2017. [GD Exh. 41].

Mr. Omogun provided security guard services to Sunny Builders NY Corp. ("Sunny Builders"). [GD Exh. 42; GD Exh. 7, Dep. Tr. 53:24-54:2, 119:22-25, 120:8-12]. He had Sunny Builders issue checks made payable to State Security Services, [GD Exh. 7, Dep. Tr. 119:17-21; 120:2-17], and he also received cash payments from Sunny Builders, [GD Exh. 7, Dep. Tr. 54:5-6]. Payments were issued from at least January through June 2017. [GD Exh. 7, Dep. Tr. 120:8-12; GD Exh. 42].

    c.  Bank Accounts

In the Petition, Mr. Omogun swore that the value of his "financial assets" were only $550, [GD Exh. 2, Petition, Form 106A/B Part 4], comprised of: (a) $300 in two checking accounts with Citibank and Chase Bank, and (b) $250 in cash. Mr. Omogun swore that he had no other bank accounts, or investment accounts of any kind. [GD Exh. 2, Petition, Form 106A/B Part 4]. Mr. Omogun swore that, other than listed in his Petition, he had absolutely no other financial assets. [GD Exh. 2, Petition, Form 106A/B Part 4]. At the Jan. 341 Meeting, Mr. Omogun swore as follows: (a) he had a personal bank account with Citibank and a business bank account with Chase Bank; (b) the Chase Bank account "is my business account, which, they already *closed* it." [GD Exh. 3, Jan. Tr. 20:19-21:2] (emphasis added). At the Apr. 341 Meeting, Mr. Omogun swore "my bank account was closed," i.e., that he no longer had any active bank account. [GD Exh. 4, Apr. Tr. 7:19-20].

At the time of the Petition, Mr. Omogun maintained a bank account, in the name of his company State Security Services, with JPMorgan Chase Bank. [GD Exh. 37]. In addition, on or about December 6, 2016, Mr. Omogun opened a new bank account with Bethpage Federal Credit Union, in the name of his company, Choice Security Company ("Bethpage Account"). [GD Exh. 51]. Mr. Omogun omitted that Bethpage Account from his 2017 interrogatory responses. [GD Exh. 12 at Interrog. Resp. No. 1; GD Exh. 7, Dep. Tr. 35:10-21]. In his interrogatory responses, Mr. Omogun swore that he had four bank accounts: (a) State

Security Services JPMorgan Chase Bank Account; (b) Omonuwa Omogun Bank of America Account; (c) Omonuwa Omogun Capital One Bank Account; and (d) Omonuwa Omogun Citi Bank Account. [GD Exh. 12, at Interrogatory Response No. 1]. The interrogatory responses themselves revealed that Mr. Omogun omitted at least two other bank accounts from the Petition: Omonuwa Omogun Bank of America Account and Capital One Bank Account. [GD Exh. 2]. Mr. Omogun, at his April 2018 deposition, admitted that, after he filed the Petition, he opened the Bethpage Account, in the name of his company Choice Security Company, and actively used that account. [GD Exh. 7, Dep. Tr. 130:5-24, 139:20-140:10]. The underlying bank account records showed extensive transactions, including deposits and withdrawals, and checks made payable to Mr. Omogun himself. [GD Exh. 50].

   d. DICOF Corp.

  At the April 2018 deposition, Mr. Omogun was asked about an entity called Dicof Corp., a for-profit corporation. [GD Exh. 52; GD Exh. 7, Dep. Tr. 60:13-15]. Mr. Omogun, under oath, swore: (a) Dicof is "not a company," [GD Exh. 7, Dep. Tr. 60:16-18]; and (b) Dicof is a non-profit organization, [GD Exh. 7, Dep. Tr. 60:25-61:2], and a "club," [GD Exh. 7, Dep. Tr. 128:8]. Mr. Omogun, under oath, also swore that: (a) Dicof does not conduct business but, rather, "We just--we meet every month to discuss issue about my country, about my town. That's it.", [GD Exh. 7, Dep. Tr. 61:4-6]; and (b) Mr. Omogun is a "member" and "public relations officer" of the Dicof "club," [GD Exh. 7, Dep. Tr. 61:14, 128:4-10]. Mr. Omogun admitted receiving a $22,556.15 check from Dicof and admitted that he deposited that check into his State Security Services bank account at JPMorgan Chase Bank. [GD Exh. 20; GD Exh. 7, Dep. Tr. 63:20-64:2]. Mr. Omogun initially admitted that the $22,556.15 was his property: "It's a personal money I give to them." [GD Exh. 7, Dep. Tr. 61:24-25]. Mr. Omogun swore that he deposited that $22,556.15 check into his State Security Services bank account, "Because he was going after my money." [GD Exh. 7, Dep. Tr. 63:13-16]. During Mr.

Omogun's deposition, he changed his testimony and denied ownership of the $22,556.15 reflected by the Dicof check. [GD Exh. 7, Dep. Tr. 66:6-9]. Mr. Omogun swore that "they gave me this check to, you know, purchase something back, you know, in Nigeria for people there, humanitarian relief." [GD Exh. 7, Dep. Tr. 62:19-23]. Mr. Omogun, building upon his new story, alleged that the funds were used for humanitarian relief but was unable to provide any details of any alleged relief. [GD Exh. 7, Dep. Tr. 64:13-14, 65:6-13; *see also* GD Exh. 7, Dep. Tr. 65:14-66:22].

In March 2017, Dicof issued a check payable to Mr. Omogun in the amount of $22,556.15, which represented the liquidation of Mr. Omogun's equity balance with Dicof and Dicof wrote to Mr. Omogun confirming same. [GD Exhs. 20, 55]. On May 19, 2017, Dicof wrote to Mr. Omogun: "Please be advised that as of 04/17/2017, your equity balance with DICOF E-trade portfolio was liquidated. You now have a zero balance as of the aforementioned date." [GD Exh. 55]. Mr. Omogun omitted his equity holding/balance in Dicof from his Petition and failed to disclose it at the January and April 2017 Rule 341 Meetings of creditors. [GD Exh. 2].

    e.  Real Properties

In the Petition, and in his Answer, Mr. Omogun swore that he is the owner of 2 Wallace Court, Valley Stream, New York 11580 ("Two Wallace") and that he owned no other real property. [GD Exh. 2, Petition, Form 101 Part 1, Form 106A/B Part 1, Form 107 Part 9; GD Exh. 7, Dep. Tr. 10-11; GD Exhs. 5-6]. In addition, in the Petition, Mr. Omogun swore that he was not holding or controlling any property that someone else owns. [GD Exh. 2, Petition, Form 107, Part 9]. At the Jan. 341 Meeting, Mr. Omogun again swore that he owns Two Wallace and no other property. [GD Exh. 3, Jan. Tr. 18:25-19:11; GD Exhs. 5-6]. Mr. Omogun specifically swore that he owns no property in Pennsylvania or North Carolina. [GD Exh. 3, Jan. Tr. 19:12-17]. The Trustee specifically asked Mr. Omogun: "Have you owned any

other real estate in the last six years." Mr. Omogun swore: "No, sir." [GD Exh. 4, Jan. Tr. 7:6-8].

At his April 2018 Deposition, Mr. Omogun admitted that, at the time of the Petition, he owned properties in Monroe County and Wayne County, Pennsylvania, which properties were registered in his name. [GD Exh. 7, Dep. Tr. 13:4-14:13, 23:3-23; GD Exh. 8]. He also admitted that, at the time of the Petition, he owned property in North Carolina, which property was registered in his name. [GD Exh. 7, Dep. Tr. 14:15-17, 15:5-9; 15:18-21, 24:9-15, 25:20-24; GD Exh. 9].

Mr. Omogun also admitted at the April 2018 Deposition that he had purchased property in Tyler, Texas in March 2016, [GD Exh. 25; GD Exh. 7, Dep. Tr. 94:8-95:5], but asserted that he subsequently sold it. [GD Exh. 7, Dep. Tr. 99:7-100:15, 110:22-23]. In December 2017, Mr. Omogun produced documents showing that on or about November 21, 2017, he sold the Tyler, Texas property to various third parties. [GD Exh. 56]. He also admitted that he bought property in Gainesville, Texas in his own name and owned it as of the April 2018 Deposition. [GD Exh. 26; GD Exh. 7, Dep. Tr. 103:13-20; Tr. 104:2-25, 109:12-14]. In Mr. Omogun's June 2017 "Letter," he admits "his failure to disclose two property (sic) in Wayne and Monroe County in Pennsylvania, one property in North Carolina, a bank account with Capital One Bank, and the existence of State Security Services Inc. and Choice Security Company" and his ownership of such "three vacant lands." [GD Exh. 11; GD Exh. 7, Dep. Tr. 33:24-34:15].

### f.  Tax Returns

Mr. Omogun swore that his tax returns are true and accurate. [GD Exh. 7, Dep. Tr. 113:2-11]. Mr. Omogun swore in his 2016 and 2017 personal tax returns that his only income stemmed from driving a cab. [GD Exhs. 29, 57]. The 2016 and 2017 tax returns did not report any income from State Security Services or Choice Security Company, even though both

companies had revenue, all of which went directly to Mr. Omogun. [GD Exhs. 2, 43-48, 34, 39, 40].

Mr. Omogun swore that he filed tax returns for his business State Security Services [GD Exh. 7, Dep. Tr. 8:23-9:3, 87:9-12], that he filed a 2016 tax return for it, and that the tax return was true and accurate. [GD Exh. 7, Dep. Tr. 87:25-88:20; GD Exh. 23]. In the 2016 tax return for State Security Services, Mr. Omogun reported zero revenue. [GD Exh. 23]. However, State Security Services had revenue in 2016. [GD Exhs. 35, 40]. In Mr. Omogun's 2017 tax return for State Security Services, he reported revenue of about $51,952. [GD Exh. 58]. However, State Security Services had more than $60,000 in revenue in 2017, based on checks obtained in discovery. [GD Exhs. 34, 35, 39, 40, 41, 42]. According to Mr. Omogun, he did not file tax returns for Choice Security for 2016 or 2017. [GD Exh. 13 at 1]. Mr. Omogun had revenue for Choice Security for both 2016 and 2017. [GD Exhs. 34, 39, 40, 43-48].

g. Connecticut Business

In 2013, Mr. Omogun registered a business in Connecticut. [GD Exh. 24; GD Exh. 7, Dep. Tr. 92:22-93:11]. In Mr. Omogun's Petition, he failed to disclose that business. [GD Exh. 2].

h. Debt owed to Plaintiff

In 2012, plaintiff filed a lawsuit in the District Court captioned *Onyenaemeka Ethelberth v. Choice Security Company et al.*, 12 Civ. 4856 (PKC) (VMS) (the "Employment Action" or "EA"), against Mr. Omogun and various corporate entities Choice Security Company, Choice Group, Inc., Choice Security Services, Inc., Choice Security Services Inc., Choice Security Services, and Choice Security Co. (collectively, "Choice Security Defendants", and together with Mr. Omogun, the "EA Defendants"). [GD Exh. 60 at Exh. A therein]. In that action, plaintiff asserted claims for, among other items, unpaid overtime wages,

liquidated damages, prejudgment interest, attorneys' fees and costs, under the New York Labor Law ("NYLL") and the Fair Labor Standards Act ("FLSA"), and for unjust enrichment. *Id.* The parties in the Employment Action, represented by counsel, conducted discovery, and filed cross motions for summary judgment. In February 2015, the District Court granted plaintiff summary judgment on his core claims. [GD Exh. 60 at Exh. C therein].

On May 14, 2015, the District Court held a conference on the motion to withdraw by counsel for the EA Defendants. On May 19, 2015, the District Court entered a Minute Order, stating in pertinent part: "The Choice Security Defendants shall have to retain [new] counsel and file a notice of appearance by June 15, 2015, or otherwise be found in default." [GD Exh. 60 at Exh. B, EA Docket at 5/14/15]. The Choice Security Defendants failed to comply with that Minute Order and a Clerk's Certificate of default was issued. [GD Exh. 60 at Exh. B, EA Docket at 6/17/15]. In January 2016, the District Court entered a default as against Mr. Omogun in the Employment Action. [GD Exh. 60 at Exh. D]. On March 30, 2016, Plaintiff filed a renewed application for default judgment and moved for an award of damages, liquidated damages, prejudgment interest, attorneys' fees and costs. [GD Exh. 60, at Exh. B, EA Docket at 3/30/16].

In August 2016, the Magistrate Judge in the Employment Action issued a Report and Recommendation ("Report") in plaintiff's favor on his claims. [GD Exh. 60, at Exh. E]. No objections were filed. [GD Exh. 60, at Exh. B, EA Docket at 8/5/16]. The District Court reviewed and adopted the Report, and on August 25, 2016, the District Court entered judgment in favor of plaintiff and against defendant (and others) (the "EA Judgment"). [GD Exh. 60, at Exh. F]. The District Court awarded plaintiff, among other items, judgment in the amount of $193,161.73, with a provision for an automatic increase of $27,443.28 based on the passage of time, in accordance with Section 663(4) of the NYLL. *Id.* The District Court expressly held that (a) "Defendants' conduct was willful under FLSA," [GD Exh. 60, at Exh.

D at 8 of 8]; and (b) "as a matter of law, Plaintiff has proved that Defendant's underpayment of wages was willful," [GD Exh. 60, at Exh. E at 6 and 12 of 30]. At this juncture, defendant's judgment liability to plaintiff includes: (a) the amount of $220,605.01 pursuant to the EA Judgment ($193,161.73 plus $27,443.28 automatic increase); and (b) additional interest to be determined. [GD Exh. 60, at Exh. F].

B.  Defendant's LBR 7056-1 Statement

Pursuant to LBR 7056-1, each summary judgment motion must include "a separate statement of the material facts as to which the moving party contends there is no genuine issue to be tried." E.D.N.Y. LBR 7056-1(c). The nonmoving party shall include in its opposition a separate statement of the material facts it contends there exists a genuine issue to be tried. All material facts set forth in the moving party's statement "will be deemed to be admitted by the opposing party unless controverted by the statement required to be served by the opposing party. Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible . . . ." *Id.* For the following reasons, the Court finds that defendant failed to comply with the mandate of LBR 7056-1.

First, defendant's LBR 7056-1 Statement merely denies certain statements set forth in plaintiff's Rule 7056 Statement without stating a factual basis for such denial or any citation to the factual record as required under E.D.N.Y. LBR 7056-1(c). Courts in this district are free to disregard each statement of material fact by a movant or opponent where there is no citation, or the cited materials do not support the statement. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (noting that each statement of material fact must be followed by citation to evidence which would be admissible as required by Fed. R. Civ. P. 56). "Merely denying certain statements in the moving party's statement of undisputed material facts without stating the factual basis for such denial and without disclosing where in the record is the evidence relied upon in making such denial does not constitute a 'separate, short,

and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried' – as is required to controvert the moving party's statement of undisputed material facts." *Covelli*, 2001 WL 1823584, at *1 (quoting *Holtz*, 258 F.3d at 74).

Second, defendant does not include a separate statement of material facts which he contends there exists a genuine issue to be tried. Instead, defendant attaches an affidavit dated October 29, 2018 ("Affidavit") in support of his LBR 7056-1 Statement. Defendant admits the contents of the transcripts of the 341 Meetings and April 2018 Deposition but seeks to explain away his prior sworn testimony with his Affidavit. Defendant essentially contends that he did not know or was never informed that he had to disclose every other company he incorporated, and every bank account opened in the name of the company. Defendant asserts that he did not disclose the various real properties outside of New York State because he forgot about the properties and the properties are not assets and are valueless.

It is "well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991); *see also Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (noting that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."); *Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 378 (E.D.N.Y. 2012). Statements in the Affidavit contradict defendant's prior testimony at his April 2018 Deposition regarding his businesses and real properties. Accordingly, the Court will not consider the responses in defendant's LBR 7056-1 Statement as they are not supported by any citations to admissible evidence and fail to raise any issue of material fact. All material facts set forth in plaintiff's Rule 7056 Statement are deemed

admitted to the extent such material facts are supported by the summary judgment record. E.D.N.Y 7056-1(c).

Despite defendant's failure to comply with LBR 7056-1, a court has "broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz*, 258 F.3d at 73. In exercising its discretion, the Court here undertakes an independent review of the record to assure that each statement of a proposed undisputed fact is supported by a citation to the record. "The local rule does not absolve the party . . . of the burden of showing that it is entitled to a judgment as a matter of law . . . and [the] statement is not a vehicle for making factual assertions that are otherwise unsupported in the record." *Id.*, 258 F.3d at 74. Indeed, "where there are no citations or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Id.,* 258 F.3d at 73-4 (quoting *Watt v. New York Botanical Garden*, No. 98 Civ. 1095(BSJ), 2000 WL 193626, at *1 n.1, 2000 U.S. Dist. LEXIS 1611, at *2 n.1 (S.D.N.Y. Feb. 16, 2000)).

III.    Discussion

A.    Summary Judgment Standard

Under Fed. R. Civ. P. 56, made applicable by Bankruptcy Rule 7056, summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'") (quoting former Fed. R. Civ. P. 56(c)). A fact is considered material if it "might affect the outcome of the suit under the governing law," and a genuine dispute exists where "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex*, 477 U.S. at 322-23. If the moving party meets its initial burden, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). Thus, to meet its burden, the opposing party must offer more than a "scintilla of evidence" that a genuine dispute of material fact exists, *Anderson*, 477 U.S. at 252, or that there is some "metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586. It must present "significant probative evidence" that a genuine issue of fact exists. *Anderson*, 477 U.S. at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

On a motion for summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). The Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 162 (2d Cir.), *cert. denied*, 549 U.S. 953 (2006). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted).

B.      11 U.S.C. § 727(a)(4)

Plaintiff argues that defendant's discharge must be denied under § 727(a)(4)(A) because he concealed assets and income in his bankruptcy schedules and during the 341 meetings of creditors by making a false oath. Denial of a debtor's discharge under § 727(a) is an "extreme penalty" that "must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (internal quotations and citation omitted); *see also Piazza v. Keswani (In re Keswani)*, Case No. 20-10315-JLG, Adv. Pro. No. 20-01345-JLG, 2022 WL 90605, at *6 (Bankr. S.D.N.Y. Jan. 7, 2022) ("The denial of a debtor's discharge is a drastic remedy.").

Section 727(a)(4)(A) states:

The court shall grant the debtor a discharge, unless—

> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
> (A) made a false oath or account.

11 U.S.C. § 727(a)(4)(A). The purpose of § 727(a)(4)(A) is "to insure that adequate information is available to those interested in the administration of the bankruptcy estate without the need of examination or investigation." *Dubrowsky v. Estate of Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 572 (E.D.N.Y. 2000).

To prevail under § 727(a)(4), the party objecting to a debtor's discharge must establish five elements by a preponderance of the evidence: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew that the statement was false; (4) the debtor made the statement with intent to deceive; and (5) the statement related materially to the bankruptcy case." *Gobindram v. Bank of India*, 538 B.R. 629, 637 (E.D.N.Y. 2015) (quotations and citation omitted); *see also Republic Credit Corp. I v. Boyer (In re Boyer)*, 328 F. App'x 711, 715 (2d Cir. 2009). Once the movant satisfies its initial burden of proving that

18

a false statement was made, the burden of production shifts to the debtor to proffer a "credible explanation." *Pergament v. Smorto (In re Smorto)*, No. 07-CV-2727 (JFB), 2008 WL 699502, at *4 (E.D.N.Y. Mar. 12, 2008). If the defendant does not produce an adequate explanation, "a court may infer fraudulent intent." *United States v. Manno-DeGraw (In re Manno-DeGraw)*, Adv. Proc. No. 8-16-08006-reg, 2016 WL 3708062, at *2 (Bankr. E.D.N.Y. July 6, 2016) (citing *In re Virovlyanskiy*, 485 B.R. 268, 272 (Bankr. E.D.N.Y. 2013)). "[T]he overall burden of proof," however, "remains with the moving party." *Moreo v. Rossi (In re Moreo)*, 437 B.R. 40, 59 (E.D.N.Y. 2010).

"A bankruptcy petition, schedules and related statements are declarations made under penalty of perjury and 'constitute a statement under oath for purposes of § 727(a)(4)(A).'" *Manno-DeGraw*, 2016 WL 3708062, at *2 (quoting *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994)). False oaths can encompass affirmative statements and omissions made not just in the debtor's petition, schedules, and statement of financial affairs but also in statements made during examinations. *Harrington v. Kupersmith (In re Kupersmith)*, 614 B.R. 428, 439 (Bankr. D. Conn. 2020) (noting that sworn statements made in the schedules and at a § 341 meeting are statements under oath for purposes of § 727(a)(4)); *Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 667 (Bankr. S.D.N.Y. 2008). "A statement is false if (1) it omits even one asset or source of income; (2) necessar[y] material information is repeatedly left undisclosed during a case's pendency; or (3) an affirmative misstatement[ ] is made and is not corrected during an examination or at any point during [the] case's proceeding." *Ng v. Adler (In re Adler)*, 494 B.R. 43, 75 (Bankr. E.D.N.Y. 2013), *aff'd*, 518 B.R. 228 (E.D.N.Y. 2014) (finding debtor made false statements when he failed to include his spouse's checking account information, his income from prior years and his ownership stake in various corporations); *see also Bank of India v. Gobindram (In re*

*Gobindram)*, Adv. Proc. No. 11-9499-reg, 2014 WL 2809078, at *5 (Bankr. E.D.N.Y. June 20, 2014) ("The plain language of [§ 727(a)(4)(A)] provides that one single false oath or account is sufficient to deny a debtor's discharge."), *aff'd*, 538 B.R. 629 (E.D.N.Y. Aug. 25, 2015). A debtor's failure to identify a business owned and/or controlled by the debtor in the schedules or statement of financial affairs gives rise to a false oath. *Keswani*, 2022 WL 90605, at *11 (finding debtor made a false oath when she failed to disclose her interest in several business entities in her amended schedules and statement of financial affairs.).

In determining whether a debtor had knowledge of the falsehood, the third element of a § 727(a)(4) claim, "[c]ourts may consider the debtor's education, business experience, and reliance on counsel . . . but the debtor is not exonerated by pleading that he or she relied on patently improper advice of counsel." *Montey Corp. v. Maletta (In re Maletta)*, 159 B.R. 108, 112 (Bankr. D. Conn. 1993); s*ee also Bub v. Rockstone Capital, LLC*, 516 B.R. 685, 695 (E.D.N.Y. 2014). Reliance on counsel is not a defense where it is "plainly obvious" to the debtor that the property should have been scheduled. *Abraham v. Stuart*, No. 15-CV-04864 (JFB), 2016 WL 4045432, at *7 (E.D.N.Y. July 28, 2016). If the debtor "knows what is true and, so knowing, willfully and intentionally swears to what is false," *In re Kaufhold*, 256 F.2d 181, 185 (3d Cir. 1958), then the knowledge requirement is satisfied. *Moreo¸* 437 B.R. at 62; *see also Capital One Equip Fin. Corp. v. Singh (In re Singh)*, 585 B.R. 330, 338 (Bankr. E.D.N.Y. 2018) (finding debtor had knowledge of the false statements where debtor was aware that mistakes and omissions were made a part of the petition and schedules and was represented by counsel).

A party can establish fraudulent intent, the fourth element of a § 727(a)(4) action, by showing that the debtor exhibited a "reckless indifference to the truth." *Gobindram*, 2014 WL 2809078, at *5 ("If a debtor is found to have exhibited a 'reckless indifference to the truth,'

that is sufficient to establish fraudulent intent"); *Bordonaro v. Fido's Fences, Inc.*, 565 B.R. 222, 233 (E.D.N.Y. 2017). When determining whether a debtor exhibited a "reckless indifference to the truth", a court may consider:

> (a) the serious nature of the information sought and the necessary attention to detail and accuracy in answering;
> (b) a debtor's lack of financial sophistication as evidenced by his or her professional background; and
> (c) whether a debtor repeatedly blamed recurrent errors on carelessness or failed to take advantage of an opportunity to clarify or correct inconsistencies.

*Adler*, 494 B.R. at 77 (internal quotations and citations omitted).

Fraudulent intent "may be established by circumstantial evidence or by inferences drawn from a course of conduct." *Dubrowsky*, 244 B.R. at 572–73. The Second Circuit has recognized that "fraudulent intent may be inferred from a series of incorrect statements contained in the schedules." *Id.* at 576; s*ee also Keswani*, 2022 WL 90605, at *11 (finding debtor's false statements and repeated failure to disclose information regarding her assets and property in her schedules and at the 341 meetings were sufficient to infer that debtor acted with fraudulent intent).

Materiality, in the context of § 727(a)(4), "merely requires a showing that the relevant information was something that creditors and the trustee reasonably would have regarded as significant in identifying assets of the estate that could be liquidated and used to satisfy claims." *Mazer-Marino v. Levi (In re Levi)*, 581 B.R. 733, 754 (Bankr. S.D.N.Y. 2017). "A false oath is material 'if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Agai v. Antoniou (*In re *Antoniou)*, 515 B.R. 9, 22 (Bankr. E.D.N.Y. 2014) (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)). "[E]ven worthless assets and unprofitable business transactions must be disclosed." *Gannon*, 173 B.R. at 320; *see also Abraham*, 2016

WL 4045432, at *8 (noting that debtors have an absolute obligation to disclose whatever interest they have in an asset even if they believe such asset to be worthless, unavailable, or exempt from creditors). It is not for the debtor to decide what information is immaterial or unimportant or which asset is of no benefit to creditors. *Levi*, 581 B.R. at 754; *O'Connell v. DeMartino (In re DeMartino)*, 448 B.R. 122, 130 (Bankr. E.D.N.Y. 2011). "Allowing debtors the 'discretion' to choose the information that is worth disclosing 'would create an end-run around the strictly created system' of bankruptcy administration." *Beer Sheva Realty Corp. v. Pongvitayapanu (In re Pongvitayapanu)*, 487 B.R. 130, 140 (Bankr. E.D.N.Y. 2013) (quoting *Siegel v. Weldon (In re Weldon)*, 184 B.R. 710, 715 (Bankr. D.S.C. 1995)). "[M]ateriality does not require a showing that the creditors were prejudiced by the false statement." *In re Robinson*, 506 F.2d 1184, 1188 (2d Cir. 1974); *see also Pergament v. Gonzalez (In re Gonzalez)*, 553 B.R. 467, 474 (Bankr. E.D.N.Y. 2016).

Here, defendant signed the schedules and the statement of financial affairs ("SOFA") under penalty of perjury declaring the information disclosed therein was true and correct and he similarly testified to the same under oath at the 341 Meetings. Defendant's schedules and SOFA state that his sole source of income stem from his occupation as an Uber driver. Interestingly, defendant did not specify in Schedule J how long he has been an Uber driver at the time of his bankruptcy filing even though Schedule J requests such information. He responded "No" to question 19 of Schedule B which inquires whether a debtor has any non-publicly traded stock and interests in incorporated unincorporated businesses. In response to question 1 of the SOFA, which requires a debtor to disclose income in the three-year period preceding the bankruptcy filing, defendant swore his income from 2014 to 2016 stems from "wages, commissions, bonuses, tips" and did not disclose any income from the operation of a business. Defendant continued to maintain in his sworn testimony at the Jan. 341 Meeting

that he does not have any businesses because they were defunct or nonoperational since 2014-2015.

There are numerous omissions and misstatements in defendant's schedules, SOFA and testimony. Defendant does not dispute the factual statements in plaintiff's Rule 7056 Statement regarding his failure to disclose his security guard businesses and their bank accounts and the income from those businesses. Additionally, defendant's businesses were not defunct. He received security business post-petition from his prepetition clients either individually and/or through Choice Security and he continued to conduct his security guard business. He also continued to train security guards through Catskill Security. Defendant incorporated State Security prepetition but waited until after his bankruptcy filing to operate State Security and then directed some of his existing clients to make payments to State Security instead of Choice Security. Defendant also admits that he failed to disclose a business entity he incorporated in Connecticut. In omitting any mention of his businesses and commercial bank accounts, defendant hindered the Trustee's ability to fully investigate his assets and financial condition, including whether there were any accounts receivable, or income owed to defendant's bankruptcy estate.

In addition, defendant's Schedules A and D list an interest in real property only at Two Wallace and did not disclose any other interest in real property. Defendant testified at the Jan. 341 Meeting that he did not own any other real property in his name during the six-year period prior to the Petition date. Yet, at his April 2018 Deposition, defendant admitted to owning two parcels of real property in Pennsylvania and two parcels in Texas, and another parcel in North Carolina for a total of five properties. Defendant does not deny he failed to disclose the various real properties.

Defendant's omissions and misstatements regarding his security businesses and real properties are material. Defendant's financial profile as a business owner with a steady

stream of security jobs from an active roster of clients and ownership interest in multiple real properties differed vastly from that of an independent gig worker with limited income and assets as portrayed in his bankruptcy schedules. Similarly, while there is some uncertainty as to Dicof's status as a not-for profit company and defendant's role at Dicof, what is clear is that Dicof had an E-trade investment account in which defendant had an interest prepetition which was not disclosed in his bankruptcy filings and defendant received funds from the liquidation of that investment account post-petition. Accordingly, plaintiff has established a prima facie case under § 727(a)(4), to wit, the making of a false oath.

In response, defendant maintains that the omissions and misstatements in his bankruptcy schedules were inadvertent and insignificant; and therefore, he could not have the requisite fraudulent intent under § 727(a)(4). As discussed above, Choice Security and Catskill Security continued to operate and accept client jobs and trainees during the years defendant claimed they were defunct. Moreover, defendant directed his clients to make payment to State Security as opposed to Choice Security and to himself. If defendant's businesses were truly not operational, defendant would have no reason for excluding his businesses and the bank accounts for those businesses in his bankruptcy schedules. The defendant's security businesses were material and defendant's failure to include information regarding his businesses in his schedules and SOFA and at the Jan. 341 Meeting concealed his true financial condition from the Trustee and creditors.

With respect to defendant's failure to disclose his interest in various real properties, defendant simply claims that he forgot he owned the properties and they're worthless. He maintains that he borrowed money from Auckland Pastures to purchase these properties and he owes more on the loans than the value of the properties because he has not made any payments on the loans. Therefore, defendant asserts that those properties are not assets he is required to disclose. As discussed above, a debtor cannot decide unilaterally what property

24

has value and whether such property constitute an asset. Rather, a debtor must disclose all real and personal property in which he has an interest and titled in his name regardless of value. Moreover, while defendant clams his omission of the real properties was purely inadvertent on his part, he listed Auckland Pastures as a creditor in his Schedule E/F (Creditors Who Have Unsecured Claims) holding three separate unsecured claims relating to a "Charge Account."

Similarly, defendant also contends that he forgot about the Gainesville, Texas property and the property is worthless. Defendant purchased the Gainesville property on November 10, 2016 using funds borrowed from Ehiaghe Imoloamen only twenty days before he filed for bankruptcy relief. On the record placed before the Court, it is implausible that defendant could have forgotten about the purchase of the Gainesville property and the property became worthless within such a short period of time. Defendant purchased the real property located in Tyler, Texas in the same year he filed for bankruptcy. He contends he did not need to disclose the Tyler property because he was holding the property in trust for a third party. Nevertheless, defendant held title the Tyler property in his name and it was for the Trustee to investigate confirm the true ownership of such property which it can only do upon disclosure of such property.

While judgments as to the credibility of a debtor's explanations generally should not be decided at the summary judgment stage, *Adler v. Ng (In re Adler)*, 395 B.R. 827, 844 (E.D.N.Y. 2008), courts in the Second Circuit have granted summary judgment under § 727(a)(4) where facts and circumstances clearly demonstrate a fraudulent intent to make a false oath on the part of the debtor. *Kupersmith*, 614 B.R. at 440 (concluding denial of a discharge on summary judgment to be appropriate where plaintiff properly supported the motion and debtor failed to affirmatively set forth facts showing there is a genuine issue for trial); *Singh*, 585 B.R. at 341 (granting summary judgment denying discharge where plaintiff

established a prima facie case and debtor failed to provide a credible explanation for the misstatements); *Antoniou*, 515 B.R. at 25 (granting summary judgment denying a discharge where the record is replete with evidence of debtor's reckless disregard for the truth and debtor did not even attempt to provide truthful information until plaintiffs objected to discharge).

The summary judgment record reflects that defendant knew the statements in his bankruptcy schedules, SOFA and at his Jan. 341 Meeting were inaccurate, incomplete, and misleading and did not reflect the true extent of his assets and financial condition. Defendant is a sophisticated businessman with experience in singlehandedly running a security business and security training school and owns several real properties. The omissions and misstatements in defendant's bankruptcy schedules and SOFA are extensive and material. Defendant was given multiple opportunities to clarify and correct his schedules and to disclose his businesses, accounts, and real properties at the various 341 Meetings or by amending his schedules, SOFA, and related documents. He did not do so. Rather, he continuously sought to minimize his assets by claiming they were defunct or worthless even in face of plaintiff's Rule 7056 Statement and the underlying summary judgment record. The Court finds defendant's omissions and misstatements, testimony at the 341 Meetings and his April 2018 Deposition, and conduct throughout this bankruptcy case demonstrate a clear disregard for the truth of his financial condition and can be for no other purpose than to conceal his assets and financial information from the Trustee and creditors. Therefore, plaintiff has established the requisite fraudulent intent on the part of defendant to conceal his assets when he made false oaths on his bankruptcy schedules and during this bankruptcy case.

In view of the evidence submitted by plaintiff and defendant's admissions, defendant's assertions regarding the false oaths in his petition and bankruptcy schedules is insufficient

to raise a genuine factual dispute as to whether the omissions and misstatements were inadvertent and must be excused. As such, each of the elements for denial of defendant's discharge under § 727(a)(4)(A) has been established, and defendant's discharge must be, and is, denied. Because the Court has concluded that defendant's discharge is denied under § 727(a)(4)(A), the Court need not, and does not, address whether defendant's discharge must be denied under § 727(a)(2) or (a)(3), or whether defendant's debt to plaintiff must be excepted from discharge under 523(a)(6).

IV.    Conclusion

For the reasons set forth above, defendant's discharge is denied under § 727(a)(4)(A). Plaintiff is to settle a judgment consistent with this Memorandum Decision and Order.

So ordered.



**Dated: July 6, 2022**
**Central Islip, New York**

**Louis A. Scarcella**
**United States Bankruptcy Judge**